## GENERAL COURT, OCTOBER TERM, 1801.

### DORSEY's Lessee *vs.* HAMMOND.

*In all cases of ambiguity arising on the face of a grant, as to the location of the land the jury is the proper tribunal to decide the fact of location, which may well be ascertained in such cases by evidence de hors the grant*

EJECTMENT for a tract of land called *Dorsey's Search,* and *The Resurvey on Dorsey's Search,* otherwise known by the name of *Dorsey's Search,* lying in Anne-Arundel county. The defendant took defence on warrant, and plots were returned. The points in

The following expressions in a grant of a tract of land, described as lying *on the W side of the N branch of Patuxent river,* beginning at a bounded red oak *standing by the said branch,* and running, &c. (three courses,) *to a bound white oak standing by the said river,* then *bounding on the said river* running S 5 deg. E. 270 perches, then *by a straight line to the first bounded tree;* and also the expressions in another grant of a tract of land, described as beginning at three bounded white oaks *standing by Patuxent river,* and *running and bounding on the said river* N 4 deg. E 87 perches. *then,* N &c. (sundry courses,) *then* N 1 deg W 48 perches, *to a bound white oak by the river,* then S 47 deg. E 388 perches, to a bound white oak, then by a straight line to the first bounded white oaks. *Held* by the *court of appeals* not to be so plain and explicit as to exclude all doubt as to the location of those tracts, viz. Whether the expressions in the last mentioned grant bound that tract on the river after the *first* line, or the expressions in the first mentioned grant bound the *last* line thereof on the river; but being cases of ambiguity the jury was the proper tribunal to decide the fact of location; thereby overruling the decisions of the *general* court made in this case

In cases where no doubt or ambiguity exists on the face of the grant, as to the location, as in the *first* line of the last above mentioned tract, or *fourth* line of the first above mentioned tract, calling for and bounding on the river, it is within the province of the court to say that no evidence out of the grant shall be *offered* to the jury, to prove that those lines did not bound on and terminate on the river, and thereby contradicting the terms of the grant as to those lines

Under the following devise, viz. "I give and bequeath to my grand son J D my Patuxent plantation, and land thereunto adjoining, called *Dorsey's Search,* lying in *Baltimore* county. to hold to him, his heirs," &c—*Held,* that the whole of the land included in the tract called *Dorsey's Search* passed to and vested in the devisee, J. D. under the will, although it lay partly in *Anne-Arundel* and partly in *Baltimore* counties

If the lines of a survey, and those of a resurvey of the same land, interfere with each other, those of the former are to prevail over those of the latter

Whether or not a defendant in ejectment, in order to make title by adversary possession alone, must show an adverse possession by *actual enclosures* for 20 years before the action was brought?

The opinions of learned counsel taken before bringing the action, not permitted to be read to the jury for any purpose

this case appear in the different *bills of exceptions* taken at the trial.

1. The question in the first bill of exceptions arose on the construction of the *certificate* and *grant* of a tract of land called *Dryer's Inheritance*, which were offered in evidence by the defendant. The said tract was surveyed for *Samuel Dryer*, on the 25th of February 1695, and the above certificate and grant stated it as "lying on *the west side of the north branch of Patuxent river*, beginning at a bounded red oak standing *by the said branch*, it being a bound tree of *Thomas Brown's*, and running N 62° W 86 perches, to a bound red oak in a branch, then N 6° W 362 perches, to a bound white oak, then N 66° E 120 perches, *to a bound white oak standing by the said river*, then *bounding on the said river, running S 5° E 270 perches*, then *by a straight line to the first bounded tree;* containing and now laid out for 254 acres of land, to be held of the manor of Anne-Arundel."

The plaintiff prayed the opinion and direction of the court to the jury, that the legal construction of the said certificate and grant was, that wherever the jury should find the termination of the fourth line of the said grant; that is, the S 5° E 270 perches line to be, that from that termination the next line must be run a straight course to the first bounded tree, the beginning of the tract, and not with the meanders of the Patuxent river.

This prayer was resisted by the counsel for the defendant, who contended that the expressions in the said grant of *Dryer's Inheritance*, according to their natural import and grammatical construction, showed that the meaning of the parties was, that the said tract should *bind with the river the two last courses;* but at least that the expressions were ambiguous, and that the meaning and intent of the parties might have been, that the binding expressions should be confined to the first of the said two last courses, or should extend to both; and being ambiguous, their true meaning and intent must be determined by inquiring into the locations of the adjoining lands taken up in that neigh-

bourhood about the same time, and by the same surveyor; into the sense in which similar expressions had been manifestly used in the certificates returned about the same time by the same surveyor; the understanding and sense of the grantees of the land, and adjoining lands, as proved by the manner they had entered upon and held their respective lands for a hundred years past, and had made improvements and buildings thereon; and by the understanding of *Richard Ridgely,* for whose use the present ejectment is admitted to be brought, and for whom, and under whose directions it is admitted, the survey of *Dorsey Hall,* on the 7th of February 1794, (being in virtue of a special warrant to resurvey *Dorsey's Search,*) was made, and from all other extrinsic facts that might lead to illustrate the said expressions; which facts and circumstances, the counsel for the defendant offered to give in evidence to the jury.

CHASE, Ch. J. *(a)*. The Court are of opinion, that it is the right, and within the jurisdiction of the *court,* to determine the *construction and operation of grants.* That what passes by the grant, and the quality of estate and interest created in it, is a question of law. The intention of the parties, which is to be collected from the words in the grant, must prevail, unless incompatible with some rule or principle of law. In determining the true construction of grants, the court cannot resort to, or draw any aid from circumstances or facts *extrinsic the grant,* unless there is some *ambiguity or uncertainty* in the description of the *person who is to take* or the *thing which is to pass.* Where there is ambiguity or uncertainty in the description of the person or thing, evidence may be given of facts and circumstances *de hors* the grant, to ascertain the meaning of the parties, which then becomes a matter of fact, determinable by the jury upon such evidence as is legally admissible before them. The common instances adduced of uncertainty in the description of the person or thing, are where there are *two persons of the same name,* or *two tracts of land of the same name.*

*(a) Duvall* and *Done,* J. concurred.

But these are only put as instances, and do not con-
fine the inquiry to those particular cases.

The court are of opinion, that the meaning of the
grant of *Dryer's Inheritance* is *plain and obvious*, and
by no means *ambiguous, or uncertain*; and that the
true construction of that part of it which is in con-
troversy, upon a view and consideration of the whole
grant, is to run from the end of the line mentioned
in the grant, to wit, south five degrees east, two hun-
dred and seventy perches, with a *straight line to the
beginning*, which is admitted by the parties on the
plots as there delineated; and therefore the court re-
ject the evidence proposed to be offered to the jury
by the defendant, as not legally admissible on the
construction of the said grant; and the court direct
the jury to run from the end of the said line with a
*straight line to beginning*. The defendant excepted,
&c.

2. The question in the second bill of exceptions
arose on the operation of a *clause* in the *will* of *John
Dorsey*, the patentee of *Dorsey's Search*, dated the
26th of November 1714, offered in evidence by the
plaintiff, viz. "I give and bequeath unto my grand-
son *John Dorsey*, son of my son *Edward Dorsey*, de-
ceased, my *Patuxent plantation*, and *the land thereun-
to adjoining*, called *Dorsey's Search*, lying in *Balti-
more county*, to hold to him during his natural life;
and from and after his decease, then I give, devise,
and bequeath my *aforesaid land and plantation*, given
him as aforesaid, unto the heirs of the body of my
said grandson *John Dorsey*, to be begotten, for ever,
and for want of such heirs, then," &c.

A device of a
tract of land by
name, and describ-
ed as lying in *Balti-
more* county, pass-
ed the whole tract
though part of it
lay in another
county

The defendant prayed the opinion and direction of
the court to the jury, that no part of the tract of land
called *Dorsey's Search*, which was situate in *Anne-
Arundel county* at the time of the execution of the
will and death of the testator, admitting the true lo-
cation of that land extended over on the west side of
Patuxent river, passed by the devise contained in the
will to *John Dorsey*, the grandson of the testator.

Oct. 1801

Dorsey
vs.
Hammond

CHASE, Ch. J. The court are of opinion, and so direct the jury, that the *whole* of the land included in *Dorsey's Search,* did pass and was vested in the devisee, *John Dorsey,* by the will of the testator, although *partly in Anne-Arundel,* and partly in *Baltimore* counties. The defendant excepted, &c.

*Certain expressions in a grant as to the running of the land, considered by the court of appeals not to be so plain and explicit as to exclude all doubt as to the location thereof, but being ambiguous, were left to jury to decide; thereby overruling the decision here made by the general court*

*Where the expressions in a grant as to the running of the land are binding and where they are not*

3. The question in the third bill of exceptions arose on the construction of the *certificate* and *grant* of *Dorsey's Search,* the original, which was surveyed for *John Dorsey* on the 6th of December 1694, and granted to him the 26th of March 1696, and is stated in the said grant as "lying at Elk Ridge, beginning at three bounded white oaks *standing by Patuxent river,* and *running and bounding on the said river* N 4° E 87 perches, then N 62°. E 50 perches, then," &c. &c. "then N 1° W 48 perches *to a bound white oak by the river,* then S 47° E 388 perches, to a bound white oak, then *by a straight line to the first bounded white oaks,* containing and laid out for 479 acres of land," &c.

The defendant moved the court to direct the jury, that according to the true grammatical construction and evident meaning of the expressions used in the said grant of *Dorsey's Search,* (the original,) the said tract from its beginning to the second boundary ought *to bind on the said river,* and not to extend over the river to the westward so as to include any land on the west side of the river, and that the expressions, "*and bounding on the said river,*" applied to the *first course,* were not in construction to be confined to *that course,* but to be extended to *the whole of the courses* stated to run from the first tree, the beginning, to the second tree by the river side.

CHASE, Ch. J. The court are of opinion, that the true construction of the certificate and grant of *Dorsey's Search,* (the original,) according to the words and expressions therein, is to run the *first course* N 4° E 87 perches, *binding the same on the river Patuxent,* and all the *subsequent courses* according to the *course and distance* until you come to the course N

1° W 48 perches. This construction, in the opinion of the court, is conformable to the plain meaning of the words, and gratifies every part of the said certificate and grant, and is pursuant to the intention of the surveyor, to be collected from words he has used. The construction contended for by the counsel for the defendant, *disregards and rejects* all the courses subsequent to the first, and cannot be admitted, there being *no call or binding expression* in either of the said courses; and therefore the court refuse to give the direction prayed, to the jury. The defendant excepted, &c. Verdict and judgment for the plaintiff.

*Ridgely, Mason* and *Shaaff,* for the Plaintiff,

*Martin,* (Attorney General,) *Key* and *Johnson,* for the Defendant.

The defendant appealed to the Court of Appeals, and the case was there argued by the above counsel *(a).*

*Ridgely,* for the appellee. The opinion of the general court is controverted by the counsel for the appellant in this case, on three different exceptions.

1st. On the construction of the grant of *Dryer's Inheritance.*

2d. On the operation of a clause in the will of *John Dorsey,* which will was dated in 1714; and

3d. On the construction of the grant of *Dorsey's Search,* the original.

*First point.* In order that this court may be enabled to decide on the legality of the decision of the general court, it will be necessary to call their attention to the plots where the lands in controversy are located and laid down. *Dryer's Inheritance* is located on the *west side of Patuxent river,* by *both parties.* Its beginning, and other bounds, are admitted, and the location of the river Patuxent is also admitted. *Dryer's Inheritance* calls for the river Patuxent, and *binds on it 270 perches,* and "thence by a straight *line to the beginning.*" By the location made by Col.

*Hammond*, the appellant, it binds upwards of 600 *perches on the river*, and does not leave the river by running *a straight line to the beginning*. By the location made by *Dorsey*, the appellee, it binds on Patuxent river 270 *perches*, and then runs a straight line to the beginning.

The question then for this court to decide is, whether the grant of *Dryer's Inheritance should run a straight line* after expending 270 perches as expressed therein, or whether it should not run a straight line from the end of that number of perches, but run and bind on the river 50 *or* 60 *courses more* than are called for in the grant?

It is contended on the part of the appellee, that the construction of the grant belongs to the court, and that the court, in making such construction, will collect the intent of the parties from the *grant itself*, and not from any extrinsic facts. It is a rule in the construction of grants, that where boundaries are called for, and courses and distances also, that the course and distance must give way to the *calls*. It is also a rule, that in collecting the intent of the parties to a grant, the whole grant should be taken together, and no part of it *rejected*, if the same can be gratified *consistently*. Let these rules be applied to the case before the court. If *Hammond's* location is correct, you disregard the expressions in the grant—"straight line," and "270 perches," and make 50 or 60 courses, and bind 680 perches on the Patuxent river between the last boundary of *Dryer's Inheritance* and the beginning. If *Dryer's Inheritance* intended to bind on Patuxent river all the way, why not have said so? Why have said run a straight line? But it is contended that the grant of *Dryer's Inheritance* shall not be construed according to its own *words* and expressions, but by other circumstances, as, by the location of other lands made by the same surveyor, by the understanding of the parties, by the manner of holding their lands, and by my directing the survey of *Dorsey Hall* 100 years afterwards. That we are not to collect the intention of the contracting parties,

(the *Proprietary* and *Dryer,*) when *Dryer* made the purchase, from the contract itself, but we are to hunt after other circumstances, some of them occurring 100 years afterwards, to know what the Lord *Proprietary* meant to sell, and what *Dryer* meant to buy, 100 years before. This doctrine, if supported, would almost destroy every grant in the state. There is scarcely a tract of land of *any extent* in *Maryland* but where encroachments have been made and trespasses have been committed. I would ask the court, whether *Dryer's Inheritance* contains any more land at this time within its limits than it contained when it was first sold to *Dryer?* What would a judge, a lawyer, or surveyor have done, if he had been called upon to lay out *Dryer's Inheritance* shortly after it was taken up? Surely, in the first place he would have made application to the land office for a copy of the courses contained in the grant; he would then have run the land out according to the expressions and courses; he would have gone to the river, bounded on it 270 perches, and then run a *straight line* to the beginning. Is there a single expression in the grant to warrant a continuance on Patuxent for *more than* 270 *perches?* What was the 270 perches *inserted for* if not to ascertain *the extent to which* the survey should bind on the river? Suppose the lands adjoining *Dryer's Inheritance* were at *this time vacant,* would any surveyor say that *Dryer's Inheritance* could, by any principle of common sense or rational construction, extend itself on Patuxent river *more than* 270 perches? Suppose *Dryer's Inheritance* had not called to *bind* 270 *perches on the river,* would not *that line* have been run course and distance? To show that the general court did right in not permitting evidence to contradict or alter the grant, let me call the attention of the court to a few authorities. No parol evidence is admissible to disannul, or substantially vary, a written agreement; you cannot depart from the writing, but may argue touching its operation. 3 *Wils.* 276. No parol evidence can be given to extend or abate a bond or deed. *Cowp.* 47. Where an agreement is in writing, no defect can

be supplied by evidence. *Bunb.* 65. Courts should be very cautious in admitting any evidence to *supply* or *explain written* agreements, when the effect is to *vary them.* 2 *Blk. Rep.* 1250.

*Second Point.* Whether the whole of the tract of land called *Dorsey's Search,* (the original,) passes by the will of *John Dorsey* dated in 1714? To be satisfied on this question, it would seem only necessary to look at the facts. On the 26th of March 1696, *Dorsey's Search* was granted under the description of "all that tract of land *lying at Elk Ridge,* in *Anne-Arundel* county." On the 27th of November 1714, *John Dorsey,* by his will, says, "I give and bequeath my Patuxent plantation, and the land thereto adjoining called *Dorsey's Search,* lying in *Baltimore* county," &c. It is admitted in the record by the appellant, that the grantee had settled this tract of land long before his death, and had a settlement on it when he made his will, and when he died. When the tract of land was taken up, it lay in *Anne-Arundel* county. By the act of assembly of 1698, *ch.* 13, Patuxent river was made the divisional line between Baltimore and Anne-Arundel counties. The land on the north of the river to be in Baltimore county, and the land on the south to be in Anne-Arundel county. The act of 1726, *ch.* 1, again added a part of that land to Anne-Arundel county, by repealing so much of the said act of 1698, *ch.* 13, as made the land lying on the north side of the Patuxent, and on the south side of the river Patapsco, a part of Baltimore county.

In the construction of this will, I contend, that by it the whole tract of land called *Dorsey's Search* passed. The intention of the testator is to be collected from the whole will, and only from the will itself. 2 *Burr.* 770. 3 *Burr.* 1541, 1574, 1622. *Cowp.* 840, 841. No technical form is necessary to convey the testator's meaning. The testator's meaning must be collected from the will itself. 2 *Burr.* 770. Where the intention is clear, too minute a stress is not to be

laid on the precise signification of words. 1 *Blk. Rep.* 377. A court may construe a will, and from what is expressed may necessarily imply an intent not founded in words. 1 *Blk. Rep.* 377. 1 *T. R.* 596. A devise is good where the description of the devisee, or of the thing devised, has been mistaken. The intent of the devisor, if apparent, will supply the want of proper words. 1 *Wils.* 247. *Gilb. Dev.* 17.

*Third Point.* As to the construction of the grant of *Dorsey's Search,* (the original.) The grant of this tract describes the land as *lying at Elk Ridge.* The first course "running and bounding on the said river N 4° E 87 perches, then," &c. *nine courses only,* between the beginning and the second boundary. By binding on the meanders of Patuxent river it makes *eighty-nine courses,* and each of them *vary altogether from the nine.* How then, without any call, can you reject those eight of the said nine courses and substitute *eighty-nine* in their place? Is there a single word in the grant which confines the running to the river? What were these eight courses inserted for? To ascertain the lines of *Dorsey's Search.* If intended to run on the river, why not have said running from the first to the second boundary, and binding on the river. What is the rule of construction? That in construing grants all *consistent* words must be retained, and none but inconsistent ones be rejected. The expressions of a grant must be gratified; they cannot be added to, nor taken from. You cannot *elongate* or *shorten* a line variant from the grant, where *course* and *distance only* are called for. The counsel for Col. *Hammond* would give to the stream of Patuxent all the *attractive powers* of the centre of gravity. They would make it partake of the qualities of the *load stone,* and draw, with its *magnetic touch,* the needle at every point of the compass. It is to restrain *Dorsey's Search,* and confine it to its meanders on one side, contrary to the courses in the grant, and in violation of every rule of construction; and it is also to *attract* to it *Dryer's Inheritance,* and thereby

make a straight line have sixty crooks, contrary to every *mathematical principle.*

*Martin,* (Attorney General,) for the appellant, in reply, contended, that the decisions of the general court, as given in the *first* and *third bills of exceptions,* as to the construction of the grants, were upon matters of fact for the jury to decide, and not for the court, and should therefore have been left by the court to the jury. If they had been left to the jury, he is satisfied a different decision would have been the result. In the case of *Martin's Lessee vs. Muse,* decided in the general court on the eastern shore, the expression in the grant was *'running down the stream,'* &c. and the jury found the course *binding on the water.* If the expressions are doubtful, surely the jury are to decide. *Helm's Lessee vs. Howard,* (2 Harr. & M·Hen. 57.) Every course in the grant of *Dorsey's Search,* (the original,) binds on the river. It takes a departure from a tree *on the river,* and runs to another tree *on the river.* There are no stops in a grant, and the operation on the whole sentence throughout, by grammatical principle, will evidence that the expressions used were intended to denote that every course should *run and bind with the river.* Suppose the expressions, *"binding with the river,"* had been at the end of the grant, instead of the beginning, would they not have extended throughout? Last words do not mitigate preceding ones. Restraining words at the end or beginning bind the whole. *Siderfin,* 328. Again, the words *"binding with the river,"* as used in this grant, should receive the same construction they would have received at the date of the grant. For words in ancient grants are to be expounded according to their ancient meaning. 4 *Com. Dig.* tit. *Parols,* (*A.* 1.) 383. *Cro. Eliz.* 905. *Lane's Rep.* 11. *Savil's Rep.* 124. And should be so construed as to carry into effect the intention of the parties by whom they are used. 4 *Com. Dig.* tit. *Parols,* (*A.* 18.) 387.

As to the *second bill of exceptions.* He contended that there was no distinction as to the manner of ascertaining the meaning of a will and of a deed. If a

rectory lie part in one county, and part in another, a
transfer of it, stating it to be situated in the one
county, will only pass the part so situated.   *Moore's*
*Rep.* 176, *pl.* 310.   A grant of a manor in the county
of **M**, which also extends to the county of **N**, will
only pass that part of it which lies in the county of
**M**.   2 *Roll. Ab.* 50, *pl.* 8.

The Court of Appeals. [*Jones, Potts,* and *Dennis,*
*J.(a)*] at November term 1803, delivered the follow-
ing opinion, viz.

. In this case there are *three bills of exceptions* pre-
sented for the decision of the court.

We disagree with the general court in the opinion
and direction stated in the *first bill of exceptions,* con-
cur with them in the opinion in the *second bill of excep-*
*tions,* and dissent from them in the opinion and direc-
tion stated in the *third bill of exceptions;* and there-
fore *reverse* their judgment in this cause.

In dissenting from the opinion and direction of the
general court in the *first* and *third bills of exceptions,*
we do not mean to say that the expressions in the
grant of *Dorsey's Search* bound that tract of land on
the river Patuxent after the first line; or that the ex-
pressions in the grant of *Dryer's Inheritance* bound
the last line thereof to the river Patuxent.   In nei-
ther case are the expressions used, in our opinion, so
plain and explicit as to exclude all doubt as to the lo-
cation of those tracts of land; and in all cases of
*ambiguity arising on the face of a certificate or grant,*
as to the location of a tract of land, we consider the
jury as the proper tribunal to decide the fact of loca-
tion, which may well be ascertained *in such cases* by
evidence *de hors* the certificate or grant.

In cases where no doubt or ambiguity exists on the
face of the certificate or grant, as to the location, as
in the case of the first line of *Dorsey's Search,* or
fourth line of *Dryer's Inheritance,* calling for and
bounding on the river Patuxent, we think it within
the province of the court to say, that no evidence out

(a) *Rumsey,* Ch. J. and *Mackall,* J. absent.

Oct. 1801

Dorsey
vs
Hammond

of the certificate or grant shall be offered to the jury to prove that those lines did not bound on and terminate on the river Patuxent, and thereby contradict the terms of the certificate or grant as to those lines.

A *procedendo* was then ordered; and at October term 1804, the cause came on again for trial in the general court; upon which second trial,

The lines of an elder survey will prevail over those of a junior survey where they interfere, &c.

4. *Mason,* for the plaintiff, prayed the opinion of the court, and their direction to the jury, that if the jury are of opinion that the lines of the tract of land called *Dorsey's Search,* and those of the tract of land called *Dryer's Inheritance,* interfere with each other, those of the former tract must prevail over those of the latter——the date of the certificate of the former being prior to that of the latter.

The defendant's counsel did not oppose the direction prayed, but consented that it might be given; and

THE COURT gave the direction accordingly.

Whether or not adversary possession must be by *actual enclosures* for 20 years before the action is brought?

5. *Mason* also prayed the direction of the court to the jury, that the defendant, to make title to the land mentioned in the declaration by adversary possession *alone,* must show an adverse possession by *actual enclosures,* for a continued and uninterrupted series of *twenty years* before this suit was brought.

*Martin,* (Attorney General,) for the defendant, said he should not object to such a direction, *because* the defendant in this cause did not mean to defend himself by possession.

The opinions of counsel not permitted to be read to the jury for any purpose.

6. *Key,* for the defendant, in his argument to the jury on the facts, offered to read to them the opinion of the Hon. *James Tilghman,* (now the chief justice of the second judicial district,) given by him in the year 1773, whilst an attorney of the provincial court. *(a)*. But

(a) Which was as follows, viz. *"Question.* Shall *Dorsey's Search,* (the original,) bind with Patuxent river, or be governed by the courses and distances in the patent?

"This is a matter of fact, and therefore I cannot speak with so much confidence of it, as if it was a point of law, where there are fixed and established rules of determination, since it (the fact) depends upon various circumstances which may influence

*Mason*, for the plaintiff, objected to the reading the
opinion of Mr. *Tilghman*, or the opinion of any
other gentleman, to the jury, on the subject now be-
fore them.   For the court of appeals, in their opinion ·
given in this case, have said that the location is a
*matter of fact for the jury*, and it will not be said
that the opinion offered to be read is evidence of any
fact in the cause.   Once admit such a practice, and
no reason can be given why the opinions of the coun-
sel engaged in the cause might not also be read, and
for aught he knew they might be *obtained* for the oc-

Ocт. 1801.

Dorsey
vs
Hammond

differently with different men, and induce opinions more or less
favourable perhaps as those circumstances correspond or disagree
with the particular situation of the persons forming their judg-
ments upon the matter   I am, however, of opinion. that *Dorsey's
Search* (the original,) shall be confined to the river, and not be
permitted to *cross it by pursuing the courses* and distances in the
patent, and for the following reasons:   The intention in grants is
chiefly to be regarded where the words made use of to convey it
will warrant and support it; wherefore, every day's practice
evinces that courses and distances are rejected, when it is appa-
rent from the grant, that *calls* for, or *references* to particular pla-
ces, should correct and control them; as for instance, running
up a river, and binding therewith N 100 perches, to a bounded
oak, though a N   course will not answer the meanders of the
river, nor the number of perches terminate at the oak, (which is
supposed to be proved,) yet the river shall bind the survey as to
the courses, and the oak as to the distance   And the expressions
in the grant of *Dorsey's Search* not only point out the intention,
but expressly direct that that survey should bind with the river,
"running and *bounding* on the said river," &c. nor was it the de-
sign that this should be gratified merely by conforming the first
course to the river, (that would be too illiberal a construction,)
but the binding expression shall run through the whole up to the
oak, which determines the extent of the survey to the north.
The direction of the river pretty well agrees with the courses ex-
pressed in the grant, and bears some resemblance to them in its
windings and turnings.   There are but three boundaries referred
to, independent of the branch—the beginning—the white oak by
the river, and the white oak at the termination of the S 47o E
388 perches line.   But if the survey was not intended to bind
with the river, is it not probable boundaries would have been
called for intermediate the first and second trees, both of which
too are on the *same side, and near the river*?   If the patentee did
not intend to have bound his survey with the river, how will the
great number of courses be accounted for?   Would he not have
run at once from A to B, and we see but two courses after he
leaves the river, which rather shows he was not fond of multi-
plying them, but was driven to insert so many as he did upon
the west, by running with the meanders of the river.   Besides,
it is most reasonable to suppose it was not in view to include the
river, because formerly branches, (and Patuxent river at the
place alluded to is but what we now call a branch,) were as cau-
tiously avoided in making surveys, as they are now industriously
sought after.   Other observations pertinent to this subject might
be deduced from *Dryer's Inheritance;* but I think *Dorsey's
Search,* with the river, furnishes sufficient for the present pur-
pose.                                  *James Tilghman*."

casion. Indeed, witnesses might be produced to prove that they heard such a lawyer say his opinion was that the location ought to be in such a particular way; and it will scarcely be objected that a verbal opinion would not be as good as a written one.

*Key* said, he had a right to read to the jury the opinion of learned men upon the subject in dispute; that it had been the constant practice to do so, and it had been done in the case of *Beall and others, Lessee, vs. Harwood,* at the last term. He admitted it was not conclusive upon the jury, but merely to show them what men experienced in land affairs thought upon the subject. The opinion of a judge, upon a question which came incidentally before the court, had often been read, and for the same reason the opinion in question may be read. It was different from opinions, as the gentleman has been pleased to say, which might be prepared to suit the occasion, or of counsel engaged in the cause; for it was given many years ago, and before the present dispute arose.

*Mason,* in reply, contended, that the opinions read in the cases alluded to had been read *to the court,* and not *to the jury,* which he considered to be very different; for there was no danger in reading any paper to the court, as they were judges of what was legal, and what not. But it was otherwise with the jury, to whom nothing should go but what was evidence in the case.

*Johnson,* for the defendant, observed, that as this case stood, there was no difference between reading a paper to the court, and reading it to the jury; since the jury here are judges of both the law and the fact, the court of appeals having expressly said, that the jury are to decide as to the location; any thing therefore which will tend to the formation of a correct judgment upon that fact, is proper for the consideration of the jury.

DONE, J. said he had *no doubt upon the subject*, but as his brethren were absent, and the hour of adjournment had arrived, an opportunity would be afforded in the morning of having the opinion of a full court upon the question. He thought the opinion should not be read to the jury. For what purpose, he asked, is it offered? Not as evidence, it is admitted; and surely nothing *but what is evidence* should go to the jury. It is not offered as law, being only the opinion of a gentleman, then an attorney of the court. The court of appeals have said the location in this case is a fact for the jury alone to decide; nothing therefore but what is *evidence* going to the establishment of the fact can be admitted to the jury. The arguments of counsel are never read to the court or jury as determining what the law is; the question as decided by the court is only relied on.

The point was not renewed when the other judges attended; and of course the opinion was not read.

*Verdict* for the defendant.